UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

PATRICIA A. BAKEWELL,

    Plaintiff,

v.

Case No. 2:16-cv-210
HON. GORDON J. QUIST

COMMISSIONER OF SOCIAL
SECURITY,

    Defendant.
_____/

# OPINION

This is a social security action brought under 42 U.S.C. § 405(g) seeking judicial review of a final decision by the Commissioner of the Social Security Administration (Commissioner). Plaintiff Patricia A. Bakewell seeks review of the Commissioner's decision denying her claim for disability insurance benefits (DIB) under Title II of the Social Security Act.

## STANDARD OF REVIEW

"Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Winslow v. Comm'r of Soc. Sec.*, 566 F. App'x 418, 420 (6th Cir. 2014) (quoting *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009)); *see also* 42 U.S.C. § 405(g). The Court may not conduct a *de novo* review of the case, resolve evidentiary conflicts, or decide questions of credibility. *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984); *see also Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003). It is the Commissioner who is charged with finding

the facts relevant to an application for disability benefits, and the Commissioner's findings are conclusive provided they are supported by substantial evidence. *See* 42 U.S.C. § 405(g).

Substantial evidence is defined as more than a mere scintilla of evidence but "such relevant evidence that a reasonable mind might accept as adequate to support a conclusion." *Jones v. Sec'y of Health & Human Servs.*, 945 F.2d 1365, 1369 (6th Cir. 1991). In determining the substantiality of the evidence, the Court must consider the evidence on the record as a whole and take into account whatever evidence in the record fairly detracts from its weight. *See Richardson v. Sec'y of Health & Human Servs.*, 735 F.2d 962, 963 (6th Cir. 1984). The substantial evidence standard presupposes the existence of a zone within which the decision maker can properly rule either way, without judicial interference. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citation omitted). This standard affords to the administrative decision maker considerable latitude, and indicates that a decision supported by substantial evidence will not be reversed simply because the evidence would have supported a contrary decision. *See Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993); *Mullen*, 800 F.2d at 545.

**PROCEDURAL POSTURE**

On November 30, 2012, Plaintiff filed a protective application for DIB. (PageID.251.) The alleged onset date was October 26, 2012, and her last insured date was June 30, 2016. (PageID.251.) In her initial application, Plaintiff alleged that she was disabled by the following medical conditions: (1) peripheral vascular disease, (2) aortabifemoral bypass, (3) stress, and (4) panic attacks. (PageID.255.) After her initial application was denied (PageID.126-138), Plaintiff requested a hearing before an Administrative Law Judge (ALJ) (PageID.146-147). On May 14, 2015, the ALJ held an administrative hearing in which Plaintiff was represented by Attorney Robert C. Angermeier. (PageID.69-114.) On July 8, 2015, the ALJ issued his decision

finding that Plaintiff was not disabled. (PageID.52-63.) The ALJ's decision became the Commissioner's final decision on July 12, 2016, when the Appeals Council denied Plaintiff's request for review. (PageID.33-35.)

**BACKGROUND**

Plaintiff was born on March 13, 1970. (PageID.251.) She has a high school degree, and has previously worked as a telephone operator and 911 dispatcher in North Carolina. (PageID.251.)

While living in North Carolina in 2011, Plaintiff began experiencing pain in her lower extremities. On November 1, 2011, a physician noted that he was "concerned about lack of pulses in the feet and cyanotic toes in a smoker with a triglyceride of 600." (PageID.357.) On December 7, 2011, Plaintiff reported severe pain in both thighs and calf muscles after walking 50-100 feet. (PageID.361-364.) One physician noted that Plaintiff's "level of fatigue is profound and is almost out of proportion to what I would expect with her anatomical findings and resting ABI's of 0.5 in both limbs." (PageID.361.) On December 15, 2011, Plaintiff underwent aortibifemoral bypass surgery. (PageID.382.) The day following the surgery, Plaintiff underwent a second operation to correct a valve profusion in her lower right extremity. (PageID.385-386.) Four days later, on December 20, 2011, Plaintiff was readmitted to the hospital due to nausea and vomiting. (PageID.387-388.) However, Plaintiff was sent home after it was determined that she was suffering from only a postoperative ileus.

In a postoperative appointment on January 23, 2012, Plaintiff reported some numbness in her right foot, but she was "doing well" and "starting to resume normal activities." (PageID.365.) The physician noted that Plaintiff had normal femoral pulses bilaterally, normal popliteal pulses bilaterally, and normal pedal pulses bilaterally. (PageID.366.) Plaintiff was

informed that she could return to work on a part-time basis and should be able to return to all normal activities in 4-6 weeks. (PageID.367) In her final postoperative appointment on February 28, 2012, the physician informed Plaintiff that that she could return to work full-time and that she should come back for a vascular study in one year. (PageID.369-370.)

Plaintiff subsequently returned to work full-time, however, she quit on October 26, 2012. (PageID.85, 92.) Plaintiff then moved from North Carolina to Northern Michigan, where her husband was already living. (PageID.86) Between her last postoperative appointment on February 28, 2012, and January 4, 2013, Plaintiff did not seek any medical treatment. On January 4, 2013, Plaintiff was examined by Dr. Joel A. Johnson, a vascular specialist at Bell Medical, Upper Great Lakes Vascular. (PageID.414.) At this appointment, Plaintiff reported "pain starting in her buttocks of [sic] her right leg and radiating down the back of her leg." (PageID.414.) Although she had palpable femoral pulses bilaterally, Dr. Johnson noted an "absence of all pulses distally in her right leg." (PageID.414.) Dr. Johnson subsequently performed an atherectomy and an aortogram with bilateral runoff. (PageID.414-428) The majority of the test results were normal. However, Dr. Johnson noted that the left side two-vessel runoff to the anterior tibial vessel and peroneal vessel was more sluggish than the right. (PageID.424.) Following the tests, Dr. Johnson recommended that Plaintiff be placed on Trental initially and, if there was no improvement, switched to Plavix. (PageID.417.) Plaintiff also had an MRI on her lower back, which was unremarkable. (PageID.645.)

Plaintiff continued to complain of the pain in her lower extremities for the next several months. On May 31, 2013, she complained that her leg pain was getting worse. (PageID.461.) On June 10, 2013, she complained of tingling in both her arms and her legs. (PageID.463-464.) On July 19, 2013, she complained of right leg swelling and left foot cramping,

and the physician noted that Plaintiff walked with a limp. (PageID.465-466.) On September 26, 2013, Plaintiff again complained of pain in her lower extremities. (PageID.459-460.)

On December 31, 2013, Plaintiff was evaluated by Dr. Curtis Marder, another vascular specialist. (PageID.446-449.) Dr. Marder noted that, "[a]pparently she did have some trash embolization event associated with surgery." (PageID.446.) Dr Marder conducted an Arterial Doppler Study and found that "there does not appear to be significant peripheral vascular occlusive disease and one is left with two etiologies for her pain; either neuropathic from vascular injury or neuropathic radicular pain from a lower back nerve root compression problem." (PageID.449.) Dr. Marder requested to see Plaintiff in one year for another appointment.

In June 2014, Plaintiff underwent EMG testing, which revealed no abnormalities. (PageID.687.) In his report, the neurosurgeon noted, "I am not sure what the cause of low back pain with diffuse lower limb pain and numbness is that accounts for her symptoms and reported inabilities." (PageID.687.) He also wrote, "Patricia has clarified that while it slows her down, she is capable of getting to where she needs to be and taking care of the things that have to be taken care of in her home." (PageID.687.) Plaintiff was subsequently referred to a physical therapist. (PageID.670-671.) Although Plaintiff initially rated her pain as a 7 out of 10, she began rating her pain lower as she progressed through physical therapy. Notably, Plaintiff rated her pain at 0, 1, or 2, out of 10 on multiple occasions. (PageID.672-682.) Plaintiff even walked to at least one of her physical therapy sessions. (PageID.679.) After two months of physical therapy, Plaintiff reported a 50% improvement in her symptoms. (PageID.680.)

On February 4, 2015, Dr. Marder evaluated Plaintiff for a second time. (PageID.699-703.) Following an ultrasound and an arterial graft examination, Dr. Marder found there "was good flow through both limbs at the graft; however, at the level of the left graft femoral

artery anastomosis and in the deep femoral, there are high velocities and significant turbulence suggesting the possibility of an anastomotic stenosis." (PageID.699.) Dr. Marder further opined Plaintiff "does have a significant component of neuropathic pain." (PageID.699.) On March 5, 2015, Dr. Marder performed a surgical revision of femoral anastomosis. (PageID.713-714) The surgery was successful, but Dr. Marder noted that Plaintiff may suffer from "some underlying element of chronic neuropathy." (PageID.717.)

At the hearing before the ALJ on May 14, 2015, Plaintiff testified that the medication she takes, specifically gabapentin, makes her feel fatigued. (PageID.90) She has trouble sleeping at night because of the pain. (PageID.90.) The pain in her legs affects her ability to pick items up off the ground, and she has difficulty balancing. (PageID.94.) On an average day after taking her medication, Plaintiff rates her pain at 5 out of 10. (PageID.96.) When the pain gets worse, Plaintiff tries to elevate her legs and keep them warm with an electric blanket. (PageID.98.) Plaintiff testified that while working as a 911 dispatcher in North Carolina, she lost focus once and disconnected from an officer when she was not supposed to. (PageID.100.) As for her anxiety, Plaintiff testified that it is very scary and she has been dealing with it for four years. (PageID.101.) On a typical day, Plaintiff performs chores around the house with breaks in between. (PageID102-103.) Plaintiff estimated that she can only sit for 30 minutes with her feet on the ground before she has to lie down or recline because of the pain. (PageID.103-104.) On her bad days, Plaintiff stated that she doesn't leave her bed. (PageID.107-108.)

## ALJ'S DECISION

The ALJ must employ a five-step sequential analysis to determine whether the claimant is disabled as defined by the Social Security Act. *See* 20 C.F.R. §§ 404.1520(a-f), 416.920(a-f); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004). At step one, the

ALJ determines whether the claimant can still perform substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i). At step two, the ALJ determines whether the claimant's impairments are considered "severe." 20 C.F.R. § 404.1520(a)(4)(ii). At step three, the ALJ determines whether the claimant's impairments meet or equal a listing in 20 C.F.R. part 404, Subpart P, Appendix 1. 20 C.F.R. § 404.1520(a)(4)(iii). At step four, the ALJ determines whether the claimant has the residual functional capacity ("RFC") to still perform past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). At step five, after considering the claimant's residual functional capacity, age, education, and work experience, the ALJ determines whether a significant number of other jobs exist in the national economy that the claimant can perform. 20 C.F.R. § 404.1520(a)(4)(v). If the ALJ determines Plaintiff is not disabled under any step, the analysis ceases and Plaintiff is declared as such. 20 C.F.R § 404.1520(a). If the ALJ can make a dispositive finding at any point in the review, no further finding is required. 20 C.F.R. § 404.1520(a).

Plaintiff has the burden of proving the existence and severity of limitations caused by her impairments and that she is precluded from performing past relevant work through step four. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). At step five, it is the Commissioner's burden "to identify a significant number of jobs in the economy that accommodate the claimant's residual functional capacity (determined at step four) and vocational profile." *Id.*

Here, the ALJ determined that Plaintiff's claim failed at step four of the analysis. He first found at step one that Plaintiff had not engaged in substantial activity since October 26, 2012. At step two, the ALJ determined that Plaintiff had two severe impairments—peripheral vascular disease and an anxiety disorder. At step three, the ALJ concluded that Plaintiff did not

have an impairment or a combination of impairments that met or equaled the requirements of the Listing of Impairments in 20 C.F.R. Part 404. Subpart P, Appendix 1.

With respect to Plaintiff's RFC, the ALJ found that Plaintiff could perform sedentary work with the following limitations:

> [O]nly occasional climbing, stooping, kneeling, crouching, crawling, and frequent balancing. The claimant will be off task 5 percent of the workday in addition to regularly scheduled breaks and is expected to be absent one day per month.

(PageID.56.) Based on the testimony of the vocational expert, the ALJ found that a person with the same age, education, work experience, and residual functional capacity as Plaintiff would be able to perform past relevant work as a dispatcher or telephone operator. Thus, the ALJ concluded that Plaintiff was not disabled as defined by the Social Security Act.

## DISCUSSION

Plaintiff raises two issues on appeal. First, Plaintiff argues that the ALJ's determination of Plaintiff's RFC is not supported by substantial evidence. Specifically, Plaintiff claims that the ALJ erred by (a) affording great weight to Dr. Dale Blum's medical opinion; (b) affording great weight to part of Dr. William Humphrey's medical opinion; (c) affording little weight to Dr. Judy Strait's medical opinion, and (d) failing to specify the reasons for the specific limitations in the residual functional capacity. Second, Plaintiff argues that the ALJ improperly assessed Plaintiff's credibility. The Court will address each issue in turn.

**1. The ALJ's RFC Finding Is Supported By Substantial Evidence.**

"Residual functional capacity is defined as the most a claimant can still do despite the physical and mental limitations resulting from her impairments." *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 155, (6th Cir. 2009) (citing 20 C.F.R. §§ 404.1545(a), 416.945(a)). The ALJ is ultimately responsible for determining a claimant's RFC, *Coldiron v. Comm'r of Soc. Sec.*, 371 F.

App'x 435, 439 (6th Cir. 2010), but the claimant is required to provide information to establish the extent of his impairments. *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999).

Here, the ALJ's RFC determination is supported by substantial evidence, including the objective medical evidence, Plaintiff's frequency of treatment, Plaintiff's daily activities, and the medical opinions of Dr. Humphrey (in part), Dr. Blum, and Dr. Kilpella.

Plaintiff complains that the ALJ erred by affording great weight to only part of Dr. William C. Humphrey's medical opinion. In March 2013, Dr. Humphrey, a consultative medical examiner, found that Plaintiff had a stable gait and could walk on her heels and toes. (PageID.432-439.) He also found that Plaintiff had no issues bending, stooping, carrying, pushing, picking up a coin, and getting on and off the examination table. However, Dr. Humphrey noted that Plaintiff's daily activities were "somewhat limited in that she can only sit for a period of 10-15 minutes and standing is also limited to a period of 10-15 minutes." (PageID.438.) The ALJ afforded great weight to the majority of Dr. Humphrey's opinion, with the exception of the limitations on sitting and standing for 10-15 minutes. The ALJ reasoned that these limitation "appear to have been provided by the claimant and are not supported by clinical findings." (PageID.60.)

The Court finds that the ALJ did not err when he afforded great weight to only part of Dr. Humphrey's opinion. Dr. Humphrey did not opine why Plaintiff was limited to 10-15 minutes of sitting or walking. And, notably, Dr. Humphrey concluded his opinion by stating, "[t]he recent tests are normal and have failed to explain why she continues to complain of pain in her lower extremities" and that "[h]er recent tests and the current examination present no objective evidence as to why she should have this discomfort." (PageID.439.) Thus, Dr. Humphrey's opinion contradicted itself. The ALJ did not err in resolving the inconsistency in Dr. Humphrey's opinion. The majority of evidence—including medical records from Plaintiff's treating physicians

and Dr. Blum's medical opinion (which is further discussed below)—contradict a finding that Plaintiff is limited to 15 minutes of sitting or walking. An ALJ "is not bound by conclusory statements of doctors, particularly where they are unsupported by detailed objective criteria and documentation." *Cohen v. Secretary of Dept. of Health and Human Services*, 964 F.2d 524, 528 (6th Cir. 1992). Therefore, the ALJ reasonably concluded that the limitation on sitting and standing was based on Plaintiff's subjective complaints and not supported by clinical findings.

Plaintiff also complains that the ALJ erred by affording great weight to Dr. Dale Blum's medical opinion. Dr. Blum, a state agency medical consultant, offered his medical opinion in April 2013. (PageID.132-134.) After reviewing Plaintiff's medical records, Dr. Blum opined that Plaintiff retained the physical capacity for light work, with the ability to occasionally lift 20 pounds, frequently lift 10 pounds, stand and/or walk for about 6 hours in an 8-hour workday, sit for about 6 hours in an 8-hour workday, and occasional stooping, kneeling, crouching, crawling, and climbing. (PageID.132-133.) In affording great weight to Dr. Blum's opinion, the ALJ stated:

> Dr. Blum's opinion is consistent with the overall record, including the claimant's improvement in peripheral artery disease with surgery, the largely unremarkable diagnostic evidence, and the largely mild clinical findings. It is also consistent with the claimant's reported activities of daily living, which include tending to her personal care, preparing complete meals daily, tending to household chores with assistance (i.e., laundry, ironing, vacuuming, and washing the floor), shopping for one to two hours at a time, and walking her dog (Exhs. 3E; 4E; 15F).

(PageID.60.) Plaintiff argues that the ALJ should not have afforded great weight to Dr. Blum's medical opinion because it was from 2013, and did not consider Plaintiff's most recent medical records. For example, Dr. Blum's 2013 opinion did not take into account that Plaintiff had developed a left anastomotic stricture in her left femoral artery graft and had undergone a second surgery in March 2015. However, an ALJ is permitted to give significant weight to a medical

opinion that is not based on the most recent medical records as long as the ALJ also addresses those records. *See, e.g.*, *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 513 (6th Cir. 2010) ("Even if [the state agency medical consultants'] RFC was completed without knowledge of [certain medical] issues, however, the record reflects that the ALJ considered them."); *McGrew v. Comm'r of Soc. Sec.*, 343 F. App'x 26, 32 (6th Cir. 2009) (finding that the ALJ did not improperly rely on state agency physicians' opinions that were out of date because the ALJ's decision considered the new medical examinations); *Terrell v. Berryhill*, 2017 WL 2588424, at *7 (E.D. KY. 2017)(same). Here, the ALJ expressly addressed Plaintiff's medical treatment that occurred after Dr. Blum gave his medical opinion in April 2013:

> Dr. Johnson performed an aortogram with runoff in February 2013, which showed a widely patent aortofemoral bypass and "excellent flow" in the common femoral arteries and popliteal arteries bilaterally (Exh. 5F /6). A subsequent graft lower extremity ultrasound performed in December 2013 also showed good flow in the femoral popliteal vessels (Exh.9F/l). Likewise, a June 2014 EMG and a December 2013 Doppler study was unremarkable, showing no significant peripheral vascular occlusive disease (Exh. 9F/4; 15F/22, 44). Another consulting vascular specialist, Curtis Marder, M.D., indicated that peripheral vascular disease was not the cause of the claimant's lower extremity neuropathic pain (Exh. 9F/4). Following the claimant's unremarkable EMG, the claimant's neurosurgeon, Richard Vermuelen, M.D., indicated that he was not sure of the cause of the claimant's diffuse low limb pain and numbness that "accounts for her symptoms and reported inabilities" (Exh. 15F/44). Dr. Vermuelen's referral, the claimant attended physical therapy from June to August 2014, and reported 50% improvement in her symptoms (Exh. 15F). Indeed, the claimant's physical therapist noted on multiple treatment visits that the claimant had no pain complaints (Exh. 15F). Notably, prior to the claimant's initial surgery, her treating provider indicated that the claimant's level of fatigue was profound and "almost out of proportion" to what he would expect given her anatomical findings and test results (Exh. 2F/14). This, coupled with the lack of diagnostic evidence as to an underlying cause of the claimant's lower extremity pain, suggests a tendency to overstate the severity of her symptoms (Exh. 2F/14).

> While the claimant's test results were unremarkable from the date of her December 2011 surgery through 2014, the claimant's treatment notes reflect that a February 2015 ultrasound and arterial Doppler study detected the possibility of anastomic stenosis at the left graft (Exh. 16F/4, 7). The claimant underwent a revision of her left aortobifemoral anastomosis in March 2015, and was discharged in stable, satisfactory condition, with instruction to ambulate at least three times daily with progressive activity as tolerated, and to avoid driving or lifting anything over 5 to 10 pounds for two weeks (Exh. 17F). In April 2015, her vascular surgeon, Dr. Marder, indicated that while she reported some cyanosis of the toes and bilateral lower extremity pain, she had an excellent surgical result with an angiogram showing excellent flow velocities to both lower extremities and no evidence of any focal stenosis (Exh. 17F). The claimant was advised to follow up in 6 months, which is not consistent with the frequency of care one would expect for an individual with a disabling impairment.

(PageID.58.) As noted by the ALJ, although Plaintiff underwent a second surgery in March 2015, the surgeon did not place any significant restrictions on Plaintiff. Moreover, there are no medical opinions from after the second surgery that contradict Dr. Blum's medical opinion. After considering Plaintiff's most recent medical records, the ALJ reasonably concluded that Dr. Blum's opinion was "consistent with the overall record, including the claimant's improvement in peripheral artery disease with surgery, the largely unremarkable diagnostic evidence, and the largely mild clinical findings." Therefore, the Court finds that the ALJ did not err when affording great weight to Dr. Blum's medical opinion.

Plaintiff also complains that the ALJ erred when he afforded little weight to the medical opinion of Dr. Judy Strait, Psy.D., L.P. Dr. Strait, a state agency psychological consultant, offered her medical opinion in April 2013. (PageID.134-136.) She found that Plaintiff's anxiety moderately limited her ability to remember detailed instructions and concentrate. She further opined that Plaintiff would be capable of performing only two-step tasks on a sustained basis. However, the ALJ disagreed with Dr. Strait's medical opinion and determined that Plaintiff was

capable of performing more than two-step tasks based on the overall record and her daily activities. Again, the Court finds that the ALJ's decision to give little weight Dr. Strait's medical opinion was supported by substantial evidence. As the ALJ notes, Plaintiff's daily activities—including cooking complete meals, embroidering, driving, and managing her finances—establish that Plaintiff is capable of performing more than two-step tasks. In addition, Dr. Strait's opinion is inconsistent with another consultative psychological examiner, Dr. Gary Kipela, Psy.D, who did not limit Plaintiff to only performing two-step tasks. Based on the conflicting opinions, the ALJ reasonably concluded that Plaintiff was capable of performing more than two-step tasks on a sustained basis.

Plaintiff finally complains that the ALJ erred by not providing a function-by-function analysis of his RFC determination. "Although a function-by-function analysis is desirable, SSR 96–8p does not require ALJs to produce such a detailed statement in writing . . . the ALJ need only articulate how the evidence in the record supports the RFC determination, discuss the claimant's ability to perform sustained work-related activities, and explain the resolution of any inconsistencies in the record." *Delgado v. Comm'r of Soc. Sec.*, 30 F. App'x 542, 547–548 (6th Cir. 2002) (citations and quotation marks omitted). Here, the Court finds that the ALJ met the requirements for articulating the RFC determination as discussed in *Delgado* by reviewing Plaintiff's medical history and functional limitations with respect to her physical and mental impairments.

Plaintiff specifically complains that the ALJ did not explain how he arrived at a finding of 5% time off-task and a single absence a month. Several district courts in the Sixth Circuit have upheld a similar percentage for being off-task when a claimant has moderate limitations to concentration, persistence, or pace. *See England v. Comm'r of Soc. Sec.*, 2016 WL

8114219, at *8 (E.D. Mich. 2016) (8%); *McNalley v. Comm'r of Soc. Sec.*, 2011 WL 7445517 (N.D. Ohio 2011) (5%). Here, contrary to Plaintiff's assertion, the Court finds that ALJ did not arbitrarily assign the 5% percent off-task figure. In the decision, the ALJ stated:

> As to the claimant's anxiety, she has reported improvement in symptoms with medication (Exh. 13F/5). The claimant's treating providers consistently note that the claimant is pleasant and their notes as to psychiatric examinations are unremarkable (Exhs. 9F; 14F). For example, in March, June, and July 2013, the claimant's treating provider noted she was oriented, had a rational thought process, appropriate mood and affect, normal insight and judgment, normal speech, and intact long- and short-term memory (Exh. 9F/17). Likewise, in April 2014, the claimant had good eye contact, appropriate mood and affect, normal speech and no thought disorder (Exh. 14F). While the claimant has reported anxiety and a high stress, she denied depression, memory loss, and attention deficit in April and August 2014 (Exh. 13F/6). Although her treating provider noted a depressed mood, the claimant made good eye contact, had normal speech, and no thought disorder (Exh. 13F/7).
>
> The claimant underwent a consultative psychological examination performed by Gary Kilpela, Psy.D., in March 2013 (Exh. 6F). Dr. Kilpela observed that the claimant was appropriately groomed and had a good sense of humor, despite being mildly anxious. She was estimated to be of high-average intelligence, had clear and articulate speech, normal thought content, an adequate attention span, and an ability to switch from topic to topic without difficulty (Exh. 6F). Dr. Kilpela diagnosed the claimant with a generalized anxiety disorder, and noted that her medication at the time (Zoloft) was not working well (Exh. 6F).
>
> While the claimant has undoubtedly experienced symptoms related to anxiety, her routine and conservative treatment history is not consistent with a finding of disabling limitations. The claimant has not sought treatment with a mental health professional, nor has she required emergency, day, or inpatient treatment for symptoms of mental impairments. Insofar as the claimant reports some distractibility and forgetfulness, this is accommodated in the residual functional capacity finding herein, which provides for an off-task allowance of 5% of the workday, in addition to regularly scheduled breaks.

(PageID.59.) Thus, the ALJ thoroughly explained Plaintiff's mental impairment and concluded that 5% off-task allowance would accommodate her mild to moderate concentration difficulties. The ALJ's finding is supported by Plaintiff's medical records and her conservative treatment history. Accordingly, the Court finds that the ALJ's RFC determination was supported by substantial evidence.

### 2. The ALJ Properly Assessed Plaintiff's Credibility And Her Subjective Complaints.

The ALJ's assessment of credibility is entitled to great weight and deference, since he had the opportunity to observe the witness's demeanor." *Infantado v. Astrue*, 263 F. App'x 469, 475 (6th Cir. 2008) (citing *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997)); *see also Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007) ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant."). Nevertheless, the ALJ's assessment of a claimant's credibility "must be reasonable and supported by substantial evidence in the record." *Rogers*, 486 F.3d at 249. "Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among the medical reports, claimant's testimony, and other evidence." *Walters*, 127 F.3d at 531.

The Sixth Circuit applies a two-part test when evaluating a claimant's subjective complaints. First, the ALJ must determine whether "there is an underlying medically determinable physical impairment that could reasonably be expected to produce the claimant's symptoms." *Rogers*, 486 F.3d at 247 (6th Cir. 2007) (citing 20 C.F.R. § 416.929(a)). Second, "if the ALJ finds that such an impairment exists, then he must evaluate the intensity, persistence, and limiting effects of the symptoms on the individual's ability to do basic work activities." *Id.* (citing 20 C.F.R. § 416.929(a)). In making this determination, the ALJ should also consider the following factors: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the claimant's

symptoms; (3) any precipitating or aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate the symptoms; (5) treatment, other than medication, the claimant received to relieve the pain; (6) measures used by the claimant to relieve symptoms; and (7) other factors concerning your functional limitations. *Id.*; *see also* SSR 96-7p.[1]

Here, Plaintiff contends that the ALJ only considered Plaintiff's daily activities when evaluating her subjective complaints. With respect to Plaintiff's daily activities, the ALJ found:

> The claimant's daily activities, as reported in the record (either in forms completed in connection with the application and appeal, in medical reports or records, or in the claimant's testimony) are not as limited as one might expect given the claimant's allegations of disabling symptoms. The claimant reports tending to her personal care (Exh. 3E). She prepares complete meals for her family daily, which takes her an hour or more with breaks from standing (Exh. 3E). The claimant tends to household chores, such as laundry, ironing and vacuuming without encouragement (Exh. 3E). She reports leaving her home weekly, and is able to do so independently, either driving or riding in a car (Exh. 3E). The claimant shops for food and other items weekly for approximately one to two hours, and manages her own finances (Exh. 3E). She reports spending time visiting with family, reading, embroidering, and using a computer daily, albeit she reports that some activity is limited by her inability to sit or stand for long periods (Exh. 3E). Notably, in July 2014, the claimant reported being generally able to do her usual activities, with the exception of prolonged periods of walking (Exh. 13F). In June 2014, the claimant informed her treating provider that while her symptoms slow her down, she is capable of "getting to where she needs to be and taking care of the things that have to be taken care of in her home" (Exh. 15F). Finally, when attending physical therapy sessions from June to August 2014, the claimant reported that she had walked her dog, washed the floor on her hands and knees, and walked to her therapy appointment (Exh. 15F). In sum, the claimant's activities demonstrate that, despite experiencing symptoms related to peripheral artery disease and anxiety, the claimant has remained able to engage in a number of normal day-to-day activities, many of which involve at least a light level of exertion, as well as the some of the mental abilities and social interactions necessary for obtaining and maintaining employment.

---

[1] SSR 96-7p was rescinded on March 16, 2016, but was binding at the time of the ALJ's decision.

> The undersigned finds the claimant's ability to participate in such activities diminishes the credibility of the claimant's allegations of disabling functional limitations.

(PageID.59-60.) However, the ALJ also considered many additional factors. First, the ALJ found that Plaintiff recovered well from her surgeries. (PageID.57-58.) After her first surgery in December 2011, Plaintiff did not seek any medical treatment from February 28, 2012, to January 4, 2013. Although Plaintiff eventually required a second surgery to address cyanosis, the second surgery was successful and the cyanosis had been resolved. A follow-up appointment was scheduled for six-months later. As the ALJ noted, this "frequency of care is not one would expect for an individual with a disabling impairment." (PageID.59.) Second, the ALJ found that Plaintiff's condition appeared to be manageable by prescription medication. (PageID.58-59.) Third, the ALJ found that Plaintiff's medical condition improved after physical therapy. (PageID.58.) Fourth, the ALJ found that none of Plaintiff's treating physicians ever imposed any long-term restrictions on Plaintiff. (PageID.60-61.) Accordingly, the ALJ addressed several factors when evaluating Plaintiff's subjective complaints and credibility, and the ALJ's assessment was reasonable and supported by substantial evidence in the record.

## CONCLUSION

For the reasons set forth above, the Commissioner's decision is AFFIRMED. A separate judgment shall issue.

Dated: April 2, 2018            /s/ Gordon J. Quist
                                                                GORDON J. QUIST
                                            UNITED STATES DISTRICT JUDGE